## CHRISMAN v. PARTEE AND WIFE.

1. MARRIED WOMEN: *May convey, but not contract to convey, their lands.* Married women may convey estates acquired since the adoption of the Constitution of 1874, but cannot make executory contracts to convey.

2. SPECIFIC PERFORMANCE: *Mutuality.* Where a husband, having use of his wife's lands, contracts to convey them, with her approbation, to one who knows that the fee is in the wife, and the husband and wife promptly join in the execution of a deed and tender it to the purchaser, and he, for no good reason, declines to accept it, and they join in a bill for specific performance and tender a good deed in court, and the Chancellor decrees performance, the decree should not be reversed on appeal. SMITH, Special Judge, dissenting.

APPEAL from *Pulaski* Chancery Court.
Hon. JOHN R. EAKIN, Chancellor.

### STATEMENT.

This was a bill by Partee and wife against Chrisman, for

specific performance of a contract for the exchange of real property.

The facts and issues, as contained in the pleadings, are sufficiently stated in the opinion of the Chancellor, which is inserted by direction of the court; and to avoid a repetition of them here, is referred to on page 38.

The hearing was upon the pleadings and exhibits, as set out in the opinion, and the following

DEPOSITIONS.

The plaintiff, Reuben D. Partee, deposed, in substance, as follows:

"About the first December, 1876, while on my way from Little Rock to my wife's place, commonly called the Mosby place, I met with Chrisman, and he asked me how I would like to exchange the place for city property in Little Rock. I replied, 'very well, if the town property was available.' The result of this interview was that three days afterwards I went to Little Rock to see his property, and he then showed me all through it. It was the Central Hotel property. The next day we went to the Mosby place to examine it. I rode over it with him—that portion of it described in the deed and contract exhibited with the complaint. He expressed himself well pleased with the place. Several days afterward he and his brother came to the place, and I went over it with them. A few days after this I went to Little Rock to see if we could trade, and during the negotiations the question of title came up, and I told him that there was no difficulty about the title; that the place belonged to my wife, and had been in the family for twenty-five or thirty years, and she inherited it from her father's estate. We thereupon went to the office of Fletcher & Bay and had the contract drawn up, which is exhibited with the complaint. A deed was also prepared for me to carry

home in Mississippi and have my wife to execute it. We lived then and now in Mississippi. Before leaving Little Rock the defendant came to me and stated that he wanted some changes made in the deed, and I left it with him to be changed and forwarded to me in Mississippi. A few days after my return home I received the deed, with a letter from the defendant, of which the following is a copy:

"LITTLE ROCK, ARK., Dec. 20, 1876.

"*Mr. Partee:*

"I send deed as you gave it to me. It is as I want it, upon second reflection.

"Respectfully,

"F. M. CHRISMAN."

"In a day or two my wife and I signed and acknowledged the deed, and I started with it the next day to Little Rock; and on my arrival there, informed the defendant that I had the deed all fixed up, and was ready to complete the contract. He replied that he was sorry to inform me that his wife would not convey with him; that he was ready and anxious to carry out his agreement, but his wife would not join him. He assigned no other reason for his refusal, and said he was willing to make the deed himself, if I would take it without his wife's joining. I told him that he ought to indemnify me against his wife's dower; but he said he could not do that. We then separated, but that night I again called on him, and told him I would take his deed without his wife's joining. He then absolutely refused to execute it or carry out the contract, and said he would have to take the consequences.

"The next day I tendered the deed to him at his office at the hotel, and at the same time demanded of him a deed to the hotel property and possession of it. He again refused to comply. The personal property, stock, farming imple-

4–38

ments, etc., included in the exchange, was all on the plantation, and was to be delivered when the deeds were executed.

"On the day that I returned to Little Rock with the deed, and offered to carry out the contract, he told me that he had been down to the place, and found everything as I represented, except the corn, which he thought was more than I represented. He had also taken possession of one of the mules and carried it off.

"He never at any time complained of any deficit in the forty-acre tract at Wildcat Landing; but at the time of the contract it was distinctly understood with the defendant that five acres of the forty-acre tract was to be reserved in the conveyance for James B. Core, in lieu of his wife's interest in the forty-acre tract. My wife and Core's are sisters, and each owns an undivided half interest in the tract.

"Chrisman was fully informed of the whole matter, and well understood that the title to the lands was in my wife, and the deed had to come from her. One day, before the written contract was drawn up, when I was showing him the lands, we would frequently stop and examine the plat of the land I had with me, showing the division of the land among the heirs of my wife's father, consisting of my wife and her two sisters and the widow. On this plat was distinctly marked the metes and bounds of the several interests—the division lines between them, and the names of the heirs on their respective parts—and I fully pointed out and explained to Chrisman my wife's interest on said plat. I had full authority from my wife to dispose of the place before I ever saw Chrisman, and pending the negotiations with him, and before the contract was drawn up, I received a letter from her, expressing the hope that I would consummate the trade. I had before informed her of the negotiations.

"The plaintiffs have been heavily damaged by having the hotel property withheld from them; and also relying upon the defendant's promise to take possession of the lands, they did not make the usual necessary arrangements to put the same in cultivation."

Mrs. Partee, in her deposition, fully corroborated her husband in his statements of her authority to him to sell the land, and to complete the negotiations and sale to Chrisman.

James B. Core, witness for the plaintiff, deposed that "I heard both parties talk about the exchange at Little Rock. I went with Partee to Little Rock to assist in making the trade. Before the signing of the agreement it was understood that Partee should go to Mississippi at once and get his wife to sign the deed to that part of the Mosby place that had been allotted to her. That part of the Mosby place had been platted by John N. Martin, county surveyor, and I think Mr. Partee had the plat in his possession. Chrisman and Partee had gone over the place a few days before the agreement was made. Chrisman came to my house, I think, twenty-third December, about two miles from the place, and talked with me about the trade he had made with Partee, and expressed himself perfectly satisfied. The place was divided by order of court six or seven years ago, between Mrs. Steven, Mrs. Core, Mrs. Partee and Mrs. Mosby, the widow, and each one's portion assigned to them separately.

"There was a fractional forty-acre block at Wildcat to be included in the trade by Partee, which belonged equally to Mrs. Partee and my wife. I had an understanding with Chrisman and Partee that I should reserve five acres of this forty-acre tract; all the rest to belong to Chrisman, with choice of the two store-houses. It was perfectly under-

stood between Chrisman and myself about the five-acre reservation.''

William Gilbert, witness for the plaintiffs, deposed that ''About the twenty-third of December, 1876, at the Mosby place, Chrisman told me that he had traded for the Partee portion of the Mosby place, and the forty-acre tract of land at Wildcat, and asked me about the stock on the Partee portion of the Mosby place, particularly about the mules. He went to McElroy's house, on the Mosby place, to look at the tools, and asked him to take care of them for him, which McElroy agreed to do.''

Samuel Humphreys, for the plaintiffs, deposed that on the twenty-third December, 1877, he met Chrisman at Deutsh's store, near the Partee portion of the Mosby place. Witness lived on the place. Chrisman told him that he had traded for Partee's place and the stock that was on it, and he got from witness one of the mules and rode it off home, leaving his pony with witness to take care of. It was about a month before the mule got back to the place. Witness lived on the Core part of the Mosby place. He had no special authority to get the mule, which he was using and which Dr. Chrisman got, but had been living on the place nearly all his life, and had permission to take up any of the stock on the place when they were not in use. He let Dr. Chrisman have the mule because he supposed it belonged to him, from what he and Mr. Core had both told him.

McElroy, for plaintiffs, deposed that he had been living on the Mosby place for ten years. On the twenty-third day of December, 1876, Chrisman came to him and told him he came by reference of Mr. Partee for information about the stock and tools. Witness gave Chrisman all the information he wanted; showed him all the tools belonging to

Partee.  He said he had traded for the Partee place, to-
gether with the stock and tools, and after examining the
tools asked witness to take care of them for him.  Wit-
ness agreed to do so, and did  do so until  some time in
February, 1877, when they and the stock and corn were
turned over to Dr. Wilburn through Mr. Core, by orders,
as he said, from Mr. Partee.  Wilburn rented the places
(the Wildcat and Partee part of the Mosby places) from
Partee for  1877.

Otho O. Badgett, witness for the plaintiffs, was present
when the plaintiff, Reuben D. Partee, tendered the deed
to Chrisman and demanded in return a deed to the Cen-
tral House property.  Chrisman declined to give the deed,
assigning as a reason that his wife would not join him in
its execution by relinquishment of her dower.  Partee then
offered to take his deed without his wife's relinquishment.
Chrisman replied that, owing to existing circumstances in
his family he would decline to make any deed at all.  Par-
tee said that he would institute suit at once.  Chrisman
replied that he expected it.

Matlock, a witness for the defendant, deposed that about
the third of January, 1877, he applied to Partee to rent the
place in controversy.  Partee at first offered to rent, say-
ing that something would have to be done with it during
the litigation to prevent waste and destruction ; but he put
witness off until the eighth, telling him to call then on his
attorney, Mr. Dodge.  He did so ; Dodge put him off till
the tenth.  He then told witness to get Partee's mule from
Chrisman and go down and see the place, and if he liked
it he would draw up the contract.  Witness did so, but
did not like the place and didn't rent it.  He left the mule
with Mr. Badgett, a relative of Partee's, at Little Rock,
and Partee afterwards sold the mule to him.  When wit-

ness went to Chrisman for the mule he said it was all right—to take him.

Before the hearing the defendant moved to suppress all the depositions for the plaintiffs, in so far as they attempt to vary or add to the written contract between the parties, and to suppress Partee's deposition, because he could not testify in behalf of his wife.

The cause was submitted to the court on the sixteenth of November, 1877. The court found that the contract ought to be specifically performed, but that there was a material mistake in the description of the lands tendered to the defendant—only a small portion of those included in the contract being included in the deed. It therefore ordered that the submission be withdrawn; that the parties have leave to amend their pleadings, to correct mistakes, or state more clearly matters of charge or defense; and that the plaintiffs bring into court, by the tenth day of December, 1877, a deed in accordance with the contract upon which the action was brought.

The following is the

#### OPINION OF THE CHANCELLOR.

*Pulaski Chancery Court.*

R. D. Partee and wife ⎫
          v.                    ⎬
F. M. Chrisman.          ⎭

This bill is brought by Partee and wife to enforce the specific performance of a contract made by Chrisman with the husband, R. D. Partee, to convey to him the property in Little Rock known as the Central Hotel.

It states that on the twenty-second day of December, 1876, defendant was the owner of said hotel property, together with all furniture, fixtures and appurtenances belonging thereto; and that complainant, Georgie M. Partee, was the

owner of a certain farm in Jefferson county, describing it particularly.

That upon that day, said R. D. Partee, acting for himself and wife, and said defendant made a contract for the exchange of said property. This contract was in writing, as follows:

LITTLE ROCK, ARK., December 22, 1876.

This is to certify that we, the undersigned, have made the following exchange of property, and that we have obligated ourselves, according to law, to adhere to the following described trade or exchange:

That is to say, that I, F. M. Chrisman, have this day agreed to exchange lots 11 and 12, block 84, city of Little Rock, Arkansas, including hotel and fixtures, for R. D. Partee's entire interest—not including widow's dower—in the place known as the Mosby place, in Jefferson county, Ark.; and also, his interest in a forty-acre block at Wildcat Landing. And that I, R. D. Partee, agree to abide by the above described trade, it being understood that both parties are to give clear titles to their respective property above described.

(Signed)                          F. M. CHRISMAN,
Duplicate.                         R. D. PARTEE.
Witnessed by
   J. L. BAY,
   H. L. FLETCHER.

A copy is exhibited of a list of the furniture and personal property belonging to said hotel, as furnished by the defendant at the time.

That complainant, R. D. Partee, proceeded at once to the State of Mississippi, where his wife then was, and they together executed to defendant, Chrisman, a valid and suficient deed, according to the terms of the contract.

This deed is exhibited by the original annexed to the bill. It is a general warranty deed from said R. D. Partee and wife to defendant, Chrisman, of certain lands in Jefferson county, Ark., particularly described by numbers; and also, "an undivided one-half interest in the S. E. $\frac{1}{4}$ of the S. W. Fr. $\frac{1}{4}$ and S. $\frac{1}{2}$, S. W. $\frac{1}{4}$ of S. E. $\frac{1}{4}$ sec. 3—less five acres off the east end of last described tract—containing thirty-six acres, more or less, all being in township 3 south, and range 10, west of the 5th principal meridian."

This deed bears date December 27th, 1876, and is duly acknowledged by both parties, in the manner required by law to pass a wife's interest in lands.

The complaint proceeds to state that said R. D. Partee returned immediately to Little Rock, and at various times from the twenty-ninth of December, 1876, till the first day of January, 1877, made tender of this deed to defendant, offering at the same time to deliver immediate possession of the property, and demanding like immediate possession of the hotel.

There is nothing in the deed to show that the lands described in it were what was known as the Mosby place, but the allegation of the bill in this regard is, that it was such a deed "as by the terms of said contract they were obliged" to make.

Defendant, on his part, after several days' delay and prevarication, as charged, finally refused to execute a deed or deliver possession, first excusing himself on the ground that he could not procure his wife's relinquishment of dower, and afterwards, when complainant, as he says, "to test his sincerity," offered to take the deed without his wife's relinquishment, then refusing altogether, and this, after he had visited and examined the Jefferson county place, and expressed himself entirely satisfied with the trade.

After allegations as to the inducements leading complain-ants to the purchase, and their damages from defendant's non-compliance, the bill, amongst other things, prays specific performance, and in case the relinquishment of dower cannot be had from defendant's wife, compensation in lieu thereof, and for general relief.

The answer of defendant, Chrisman, denies that he made any contract at all with complainants, in manner and form as alleged in the complaint, or otherwise; denies that R. D. Partee was acting for his said wife, or had any authority to do so in making the alleged contract; denies that there was any consideration for the alleged agreement.

He admits the signature of the instrument exhibited, but denies that complainant, Georgie, was known to him in the contract; claims that he was led to believe, and did believe, that the property belonged to R. D. Partee.

He says there was a deficit of about ten acres in the forty-acre tract, of which he was not apprised until after said Reuben D. had left Little Rock.

He says that said R. D., at the time of the alleged contract, also agreed to deliver to him certain personal property, in which he has failed. A list of the property is set forth.

And generally denies all matters and things material in said complaint, not specifically denied.

This is the substance of the answer, leaving out conclusions and matters of law urged and submitted. In accordance with the expression of the court, formerly made, that all matters of law would be reserved for the hearing, he expressly appends to his answer a demurrer, and for cause says:

1. That the complaint does not show cause of action, nor—

5–38

2.   A case upon which to decree specific performance.

3.   That there is no mutuality in the contract.

4.   That it does not show that said Reuben D. had authority to act for his wife.

5.   That a married woman cannot constitute her husband her agent to sell her lands, or to make a contract for sale that would be binding upon her.

6.   That a married woman cannot make an executory contract ; and—

7.   Because this court has no jurisdiction, the lands being in Jefferson county.

Of the above the third, fourth, fifth and sixth causes are argumentative, and included in the first and second.

The seventh does not apply, as the property concerning which specific performance is sought, lies in this county.

The Jefferson lands are alleged to have been the consideration.

The demurrer is, in effect, a general one, and as such, will receive due consideration with the merits.

Defendant, before hearing, moved to suppress the deposition of R. D. Partee, as being in favor of his wife, and also, so much of the depositions of other witnesses as tends to vary or add to the terms of the written instrument.

As to the latter motion, the court will so regard it as to give no effect to any testimony not properly admissible ; and as to the former, I am of the opinion that any testimony which R. D. Partee would give should be considered primarily in his own interest, and not incompetent, because having joined his wife with him in this suit, and thereby conceded her rights to the fruit of any decree to be made, such testimony would inure to her benefit also.    He is entitled to all his marital rights in the property here, if recovered, as he is to the Jefferson property, if he fails.   The contract was made with him, and he is to be regarded as the active complainant, and

not as the bare trustee. There would be more reason in excluding that of his wife, although I consider each entitled to consideration *pro interesse suo*. The testimony of the wife, however, is not important, and will not be regarded.

Before proceeding to the evidence, it is best to clear away any confusion regarding the force of the agreement, as expressed upon its face. It is not, in any view, the contract of complainant, Georgie M. Partee. It is the contract of R. D. Partee alone, with defendant, Chrisman, in which he binds himself to make to Chrisman a clear title of his interest in the "Mosby place," whatever that may be, together with "a forty-acre block at Wildcat Landing," and in consideration of which defendant binds himself to make to Partee a clear title to the lots in question.

Partee is bound by this contract, whether he made it in his wife's behalf, or by her authority or not. Chrisman might maintain an action at law upon it, if Partee has promised more than he can fulfill, and his promise is at law sufficient consideration for Chrisman's. It is a personal obligation, which he makes at his peril, and if he fails to procure the assent and co-operation of his wife or any one else in its performance, and which may be essential, he brings on himself the penalty of being compelled to respond in damages. On the other hand, if he should perform, and Chrisman should fail on his part, the latter would then be in like case, and certainly, in an action at law, could not plead "no consideration." The contract is good at law as between Partee and Chrisman, on its face, provided it has sufficient certainty, without any reference whatever to Partee's wife. She had the right, on being advised of the obligation her husband had thus voluntarily assumed, to convey her lands in furtherance of his purposes, and thus to justify the assurance he felt in making the contract; and this would be true even if he claimed the conveyance from

Chrisman to himself.   For a wife is not restrained in her discretion to dispose of the corpus of her property, provided there be no fraud in the matter, nor undue influence, and she pursue the statutory method.   She was not a necessary party to this suit   If the husband has any right to specific performance, he has it in himself, *sui juris,* for the whole fee simple, if he had chosen to claim it.   It is commendable in him to have joined her with him, thus conceding an equity, and enabling the court to mould any decree to which he might be entitled, in such a manner as to vest in her the same interest in the property recovered which she had in that given as a consideration.   Doubtless this was the original intention of husband and wife, and the court can well see how the husband considered himself as acting for the joint benefit of himself and wife ; but that does not alter the legal aspect of the case, nor is it conceivable what interest the defendant can have had in the motives of the parties concerning each other ; nor how it can concern him now, if he be found bound to specific performance, whether the court shall decree the property to be vested in R. D. Partee alone, or in his wife, subject to his marital rights.

Disembarrassed of all immaterial considerations, the real questions are :

1.   Is the contract sufficiently *certain* on its face to be valid in law?

2.   If so, is it such a contract, and attended with such circumstances, as to call upon the sound equitable discretion of a court of Chancery to administer the peculiar relief of specific performance ; or must the parties be left to legal remedies?

The first is to be determined by the contract itself.   The undertaking, on defendant Chrisman's part, the thing sought now to be specifically enforced, is absolutely certain.   It is to convey two described lots, but if the consideration, being

also executory, is too uncertain to be valid, the whole must fall. This was an greement on Partee's part to make to Chrisman a clear title to "his entire interest (not including the widow's dower) in the place known as the 'Mosby place,' in Jefferson county, Arkansas, and also his interest in a forty-acre block at Wildcat Landing." There is no patent obscurity in this. It means to say that there is a place in Jefferson county called the *Mosby place*, and also at Wildcat Landing *a forty-acre block*, in both of which Partee claims an interest, and both of which he agrees to convey to Chrisman. The definite article is used in describing both, to mark a special Mosby place, and a particular block; not any place in Jefferson county, nor any forty-acre tract near or at Wildcat Landing. If there is any obscurity it is latent, and would be developed by proof that there were two or more places in Jefferson county called the "Mosby place," or two or more forty-acre tracts at Wildcat Landing, in which Partee claimed an interest. Such latent obscurities, either in deeds or wills, may be removed by parol proof, and the instrument hold good.

If no such obscurity be developed, the instrument stands good on its face. It is as if one in England should convey his manor by name, or a certain tract of land called blackacre in a named parish. So in this country, it is not necessary to convey by government surveys, or recorded plats, or courses and distances. Any description which may be identified by inquiry *in pais*, is sufficient. I think it will not be doubted that if Chrisman had performed his part, and had sued Partee at law for failure or refusal, he would have been entitled to show what land was meant, and to have recovered. I therefere conclude the contract to be valid on its face.

Ought complainant to have specific performance, or be left to his remedy at law? This requires an examination of

the evidence; for it is not done *ex debito justiciæ* in all cases of legal contracts. It is matter of course only when there are no equitable considerations arising out of the circumstances to influence the discretion of the court against it, but in the absence of these, it is now never refused. The whole doctrine of title bonds goes upon the idea that a contract to convey, itself transfers the equitable title to the land.

The evidence shows that the Mosby place was well known; that it had descended to several heirs, of whom Mrs. Partee was one. The plantation had been divided amongst them by commissioners, and a plat made, showing the interests of each. This plat is exhibited with the deposition of R. D. Partee. Upon it in one place his wife's portion is designated, "No. 1, Mrs. G. M. Partee, 280 acres." This portion embraces the S. E. ¼ and the N. ½ of S. W. ¼ of Sec. 13; and the N. E. ¼ of the S. E. ¼ of Sec. 14.

In another place is marked, "No. 1, Mrs. G. M. Partee, 102 acres." This embraces the west half of the N. W. ¼ and the N. W. ¼ of S. W. ¼ of Sec. 14, with the exception of a narrow strip running along down the east side of the three tracts of fractional forties included in the adjoining lands marked to Mrs. Core.

Before the trade was made Partee examined the Central Hotel property. He and defendant went next day to the Mosby place, rode over it and examined it—or, as complainant says, "that portion of it described in the contract filed as exhibit 'A,' and conveyed to said Chrisman by deed from myself and wife, marked as exhibit 'C,' and filed with the complaint." Upon one occasion, prior to the contract, Partee was riding over the land, showing it to defendant; they had this plat with them, and would occasionally stop and examine the land, by reference to the plat, which was explained to Chrisman, and the interests and distinct por-

-tions of the several heirs pointed out. He was distinctly told that the land belonged to Mrs. Partee.

The evidence is positive that the land was examined, and the contract made with reference to this plat, and if this plat does not identify what was meant by "his interest" in the Mosby place, there is nothing which does.

The lands in the deed tendered are described as follows: "The S. pt. of S. W. $\frac{1}{4}$ of S. E. $\frac{1}{4}$, and S. pt. of S. $\frac{1}{2}$ of S. W. $\frac{1}{4}$ of Sec. 14, containing 102 acres, more or less; and the N. W. $\frac{1}{4}$ of N. E. $\frac{1}{4}$ of Sec. 14—40 acres; and the W. $\frac{1}{2}$ of S. E. $\frac{1}{4}$ of Sec. 13—80 acres; and the N. E. $\frac{1}{4}$ Sec. 13 —160 acres, besides the lands in section 3, heretofore mentioned."

I think I have never met a more amusing tripartite error in the course of a twenty years' practice amongst conveyances among government surveys. Here Chrisman, Partee and the draftsman of the deed, the last of whom should have been skilled, and the first two of whom were deeply interested, have attempted to transfer title to nearly 400 acres of Mrs. Partee's interest in the Mosby place, and have so misdescribed it as to have included only 80 acres of land to which Mrs. Partee ever claimed title at all. Instead of that, they have inserted 102 acres which, by the plat, did not belong to the Mosby place or any of the heirs; a slice of the dower lands, and 160 acres of Mrs. Core's. This deed Chrisman took home with him and examined, and sent it by letter to be executed as satisfactory. It was so executed and returned, and tendered as a compliance with the contract. Chrisman made no objection to the description of the property, but refused positively to receive it, on no good grounds assigned, and in evident anticipation of unpleasant consequences to result from his refusal.

It is deliberately offered in a suit for specific performance, and in a litigous controversy passes without objection or

criticism on either side.  It is submitted in this shape to the Chancellor, who, knowing well the usual care and ability of the counsel on both sides, might have entertained some uneasy doubts as to whether or not his own wits were wool-gathering, had he not been relieved by the happy discovery that all parties had read the surveyor's plat wrong side up, making that north which should be east.  So held, all would go fair and even, but for the fact that sections 12 and 24 would appear respectively on the left and right of section 13, and section 14 below it, against which the surveyor might, on his part, entertain such decided objections as to materially weaken the force of the exhibit as evidence.

Seriously, the mistake, although somewhat absurd, is a very natural one, and might easily escape the notice of even careful and able attorneys, not practised in careful readings of descriptions of land by government surveys.  Taken in connection with the plat, and the key to the solution of the riddle, it is perfectly certain that Partee and wife sold and meant to convey, and Chrisman was satisfied they did so mean to convey, the identical lands marked on the plat as the portions assigned to Mrs. Partee, and which he had examined with reference to their purchase.  But neither the plat nor the solution of the riddle would go with the deed, and Chrisman would get no title from it to Mrs. Partee's part of the Mosby place, save 80 acres.  In the case of Partee's acting *sui juris*, it would be easy enough, and proper for the court to correct a mistake so obvious; and if, in other respects, a specific performance were proper, decree the title in the proper lands directly to defendant Chrisman, without requiring a new deed.  But very grave doubts suggest themselves as to the propriety or policy of reforming the deed of a married woman, so as to make it accord with her supposed intention, or decreeing divesture of her title under any circumstances, where it might be

Chrisman v. Partee and wife.

proved that she had attempted to do so by the statutory mode, and had failed. Courts of Chancery have ever exercised extreme caution in disposing of the property of *femmes covert* in any other mode than that pointed out by Statute, and rarely, if ever, do so, unless the *femme covert* is personally brought into court, and the court is satisfied, upon examination, that she freely assents to, and desires such a disposition. The fact that she is a party plaintiff will not of itself suffice, except where she is herself the real party directly interested, and the very relief in question is sought, and the court is well satisfied that the suit was brought by her consent  The court cannot know that she now desires to make a conveyance, which she attempted to make a year ago, and failed. Besides, the deed purports to convey about 36 acres in section 3. There is nothing in the deed itself, nor in the description of the lands, to connect them with "a forty-acre block at Wildcat Landing," and the court finds it impossible, clearly, by irresistible deduction, or even from strong probabilities, to settle itself in the conviction that the 36 acres so described, in section 3, is indeed the same forty-acre block the parties intended in the agreement.

The witnesses allude frequently to what seems to have been a forty-acre tract, well known amongst them at Wildcat, belonging to Mrs. Partee and Mrs. Core, her sister, which seems to have been well understood as included in the trade, subject to an abatement of five acres for Mrs. Core's interest, and it seems clear enough that Chrisman assented to these terms. But that does not wholly clear up the mystery difficulty, or even touch it. What tract was that? By what name was it known, and how can it be identified with the description by numbers given in the deed? The deed itself does not make the identification. *Non con-*

*stat* that Chrisman, in taking this deed, would get the identical tract at Wildcat for which he bargained.

There is another consideration not without its bearing. It appears incidentally from the evidence that the land has been rented for the present year. Chrisman would not be bound by that, and the court would be compelled, if specific performance were decreed, to defer the possession of Chrisman, or interfere with the rights of third parties.

I am satisfied from the whole case that defendant Chrisman, has wilfully determined to recede from his contract, which he had deliberately entered upon, and that if he had co-operated in good faith with complainant, to carry it out, there would have been no difficulty in his obtaining all that for which he had bargained. But for his peremptory refusal to convey, even after complainant had agreed to accept his deed without his wife's relinquishment, all mistakes might have been, and doubtless would have been at once corrected. The mistake in the description of the lands was mutual, and was not made ground of refusal. If he had objected to the description of the Wildcat lands, doubtless Partee would have given him full assurance. It is evident that Partee and wife were desirous of fulfilling their contract to the letter, and in its full spirit and meaning ; and quite as clear that defendant had deliberately determined to recede from it, whatever might be the consequences. And the subsequent renting of the lands, if they have been rented, was made necessary, or at least prudent, by his refusal to take them.

Whilst I cannot, under the difficulties of this case, in accordance with the cautious rules applied to specific performance by courts of equity, in the administration of this delicate branch of jurisprudence, grant the desired relief at once, by allowing complainant to amend the description in his bill, and decreeing to each party their respective por-

tions, I cannot at the same time fail to recognize that the complainant has regulated his conduct and his business affairs in good faith, upon the design of abiding by the contract, and with the just expectation that defendant, on his part, would do the same.

It is contrary to all settled principles of equity, and shocking to a sense of justice, to hold that he has forfeited any rights by a mere mistake of so obvious and natural a character, that neither he nor his wife, nor the draftsman, nor the defendant, nor the attorney of either party have discovered it at all. It had no influence whatever on defendant Chrisman's refusal, who does not assert directly, nor as I understand his attorney, mean to imply that he had any serious doubt that the joint deed of Partee and wife conveyed all he contracted for. The delay of a year, and change of circumstances regarding the property, resulted from defendant's refusal to abide by the contract, which is no whit mitigated by the discovery now of a mistake in the deed tendered. Equity endeavors always, as far as practicable, in each particular case, to administer relief by considering that as done, which the parties ought in conscience, in good faith to have done. And especially to compel parties to observe their solemn contracts. The whole business of the community rests upon the security which men feel in contracts solemnly reduced to writing, and executed by the parties to be bound thereby. Without this security no man can lay his plans for the future.

At law, Partee can only recover positive damages, in money, such as he can prove he has actually sustained, as the direct consequence of Chrisman's breach of contract. Will any one say that is an adequate compensation for the wrong in this case? Courts of equity have always retained so much of the feudal respect for land as to hold that no money damages can be a full compensation for its depriva-

tion, and have never refused to interpose for its permanent protection, even where damages might be recovered at law : which, in cases of personal property would be considered as fully adequate. The effects of the delays consequent upon the refusal of defendant, the annual rents of both places for the year 1877, and compensation for personal property, the status of which may have meanwhile been changed, are matters which may in a proper state of case, be all equitably adjusted by reference to the master ; or if they cannot fully, the parties are not *in pari delicto*, and a court of equity might be content with the nearest approximation. But such a reference could only be had upon a decree in favor of complainants for the main relief, and as incident thereto, I feel that it would be unjust to dismiss this cause for want of equity, and I cannot now decree any relief. Justice requires that complainant be allowed to do what he contracted and intended, if he can, and that the defendant be compelled to comply, or show reasonable cause against it. The case has been submitted under a mutual mistake. The submission may be recalled, and the cause returned to the rules for further proceedings. Complainants may amend their bill to describe precisely the interest in the Mosby place, and the forty-acre tract at Wildcat Landing, referred to in the contract, and may have reasonable time to tender a deed thereto, and to make any necessary proof to identify the descriptions in the deed tendered, with the property described in the agreement.

Meanwhile, either party may amend pleadings, or take further proof, with leave to either, if the cause be protracted beyond the year, to apply for a receiver.

For the present let the record show the filing of this opinion, and order that the submission of this cause, heretofore made be recalled, and that the cause stand on the docket for further orders, with all questions of law or fact

reserved, and that either party may amend pleadings, so far as may be necessary, to correct mistakes, or state more clearly matters of charge or defense, and also to take additional proofs. And it is further ordered that complainants bring into court, by the tenth day of December, a deed in accordance with the agreement of R. D. Partee, upon which this action is brought.

JOHN R. EAKIN,
*Chancellor*, etc.

Afterwards, within the time allowed, the plaintiffs brought into court a deed correctly describing the lands found by the court from the evidence, to be embraced in the contract, and thereupon, on their application—the defendants saying nothing further—the court decreed specific performance of the contract, requiring the defendant to execute to the plaintiff, Georgie M., a deed for the lots and appurtenances in Little Rock, and to accept the corrected deed for the lands in Jefferson county ; and further decreed that the title of Mrs. Partee in the lands be invested in Chrisman, and his title to the hotel property be invested in her, as of the date of the contract of exchange—the twentieth of December, 1876 ; and that all questions in regard to the personal property claimed by each from the other party, and questions of damage to the plaintiffs by the defendant's non-performance of the contract, and of the rents and profits due to each be referred to a master for an account.

The report of the master and subsequent proceedings are not material to an understanding of the questions determined by the court, and are therefore omitted.

From the final decree Chrisman appealed.

*W. G. Whipple*, for appellant:

I. Equity will not decree specific performance of a con-

tract of a husband to convey his wife's separate estate in lands.

The lands belonged to Mrs. Partee. *Act April* 28, 1873 ; *Sec.* 4193 *Gantt's Digest; Const.* 1874, *Art.* 9, *Sec.* 7 ; and not necessary for her to record her separate statutory estate. *Act December* 15, 1875 ; *Sec.* 8, *Session Laws* 1875, *p.* 174, repealing *Sec.* 4201 *Gantt's Digest.*

Partee had no interest in the lands. *Sec.* 4193 *Gantt's Digest; Forbes* v. *Sweeny, Sup. Ct. Neb., April T.,* 1879 ; *S. C. Reporter, Vol.* 7, *p.* 688 ; *Bishop on Married Women, Vol.* 2, *Secs.* 148, 149, 150 ; and his contract was *void.* *Bishop on Married Women, Vol.* 1, *Sec.* 601 ; *Parsons on Contracts, Vol.* 3, *\*p.* 413 ; *Story Eq. Jur., Vol.* 1, *Secs.* 731–2–3–4–5 ; *Weegan* v. *Boyle,* 19 *How.,* 148 ; *McCann* v. *Janes,* 1 *Robinson, Va.,* 256 ; *Peeler* v. *Levy and wife,* 11 *C. E. Greene, N. J. Eq.,* 330 ; *Emery* v. *Ware,* 8 *Ves.,* 513 ; *Welsh* v. *Bayard,* 6 *C. E. Greene, N. J.,* 187 ; 2 *Chitty Cont.,* 1485–6, *Note N.,* 11 *Am. Ed.; Pomeroy on Cont., Sp. Perf., Secs.* 456, 463, *and N. I. to Sec.* 442 ; *Otread* v. *Rounds,* 4 *Vin. Ab.; Emery* v. *Ware,* 8 *Vesey; Martin* v. *Mitchell,* 2 *Jas. and W.,* 414 *et seq.; Paid* v. *Young,* 4 *Am. L. Reg.,* 412, *S. C.* 2 *Stock., N. J. Eq.; Luse* v. *Deitz.,* 46 *Iowa.,* 206 (1877) ; *Fry on Sp. Perf., Sec.* 286 ; *Jarman* v. *Davis,* 4 *Monroe,* 115 ; *Benedict* v. *Lynet,* 1 *John. Ch.,* 370 ; *Tyron* v. *Watts,* 1 *M'd. Ch.,* 13 ; *Rogers* v. *Brooks,* 30 *Ark.,* 627, 631.

II.   There being no *mutuality,* equity will not enforce the contract. *Keatts* v. *Rector,* 1 *Ark.,* 415 ; *Fry on Sp. Perf.,* 133, *and c. c.; Paris* v. *Haley,* 61 *Mo.,* 457 ; *Greenlee* v. *Greenlee,* 22 *Pa. St.,* 225 ; *Levy* v. *Huber,* 3 *Watts,* 368 ; *Watts* v. *Kinney,* 3 *Leigh. Va.,* 272 ; *Bishp. Eq., Sec.* 377 ; *Pom. on Cont. Sp. Perf., Sec.* 163, 165 ; *Luse* v. *Deitz, sup.; Duvall* v. *Meyers,* 2 *M'd. Ch.,* 401 ; *Martin* v. *Halley,* 61 *Mo.,* 196 ; *Dowers* v. *Collins,* 6 *Hare,* 441 ; *Moore*

v. *Fitz Randolph*, 6 *Leigh*, 175 ; *Fry Sp. Perf., Sec.* 286, *et seq.; Sugden on Vendors,* *p. 22 ; *Pomeroy Sp. Perf., Sec.* 166 ; *Bodine* v. *Glading,* 21 *Pa. St.,* 50.

Even if Partee had any interest in his wife's lands, by virtue of his marital relations, "A husband cannot be decreed to convey a life estate in his wife's lands during her life." *McCann* v. *Janes,* 1 *Rob., Va.,* 256.

Specific performance is always *discretionary* with a court of equity, and will not be enforced if it will work injustice to either party. 15 *Ark.,* 327 ; 16 *Ib.,* 367 ; 19 *Ib.,* 59 ; 21 *Ib.,* 116 ; 34 *Ib.,* 676 ; *Story Eq. Jur., Vol.* 1, *Secs.* 742, 750 ; *Parson's Cont., Vol.* 3, *p 350–1 ; 51 *Penn. St.,* 281 ; 4 *Peters,* 342 ; 61 *Mo.,* 196, *Oct. T.,* 1875.

*John H. Cherry,* for appellant :

The contract was void for want of *mutuality.* 29 *Ark.,* 658 ; 30 *Ark.,* 385 ; 33 *Ark.,* 432 ; *Pilcher et al.* v. *Smith et al.,* 2 *Head. (Tenn.),* 208 ; *Sugden on Vendors, p.* 230, *Sec.* 14 ; *Pom. on Sp. Perf. Cont., Secs.* 459, 463, *and Note* (1) *to* 442 ; *Peeler* v. *Levy and wife,* 11 *C. E. Greene (N. J.) Ch.,* 331 ; *Welsh* v. *Bayard,* 6 *Ib.,* 186 ; *Addison on Cont.,* 74 ; *Harris* v. *Mott,* 14 *Beav.,* 169 ; *Emory* v. *Ware, supra; Martin* v. *Mitchell,* 2 *Ja. and W.,* 414 ; *Nicholl* v. *Jones,* 3 *L. R.* 30 *Vic.,* 710 ; *Avery* v. *Griffin,* 6 *L. R.* 32 *Vic.,* 606 ; *Castle* v. *Wilkerson,* 5 *L. R. Ch. App.,* 534 ; *Chaffee* v. *Oliver, East Dist. Ark.* (1880), *Fed. Rep., Vol.* 3, *p.* 607 ; 16 *Gratt.,* 109 ; 2 *Caldwell,* 632 ; *Lomax, Vol.* 2, *p.* 70, and other cases cited in associate counsel's brief.

A contract by the husband alone, or by the husband and wife, for lands of the wife, in which he may have an interest, will not be enforced. *Bronson & Ward* v. *Cahill,* 4

*McLean*, 19, and cases above; also *Pom. on Sp. Perf.*, (1879); *Emory* v. *Ware, sup.*

The contract was void *ab initio* for uncertainty, and for lack of mutuality of obligation, the lands being the *separate* statutory estate of the wife. See cases cited *supra*.

*Dodge & Johnson*, for appellees:

A wife is not restricted to dispose of her property, provided there be no fraud, etc., and she pursues the statutory remedy. *Gantt's Digest, Sec.* 849; 2 *Bish. Mar. Wom., Sec.* 370–1, *Note* 3; 2 *Kens. Com.*, 167; *Const.* 1874, *Art. IX., Sec.* 7.

On the question of *mutuality*, cite *Chitty on Cont.*, 11 *Ed.*, p. 1425; *Simons* v. *Stewart*, 1 *Ch'y. Rep.*, 610; *Willard* v. *Taylor*, 8 *Wal.*, 557; *Salisbury* v. *Thatcher*, 2 *Young & C.*, 54; *Martin* v. *Pycroft*, 2 *De Gex. M. & G.*, 795; *Wyns* v. *Morgan*, 2 *Vesey*, 202; *Morelock* v. *Butler*, 10 *Vesey*, 292; *Eyrston* v. *Simonds*, 1 *Young & Col.*, 607; *Murrell* v. *Goodyear*, 1 *De Gex, F. & J.*, 432; *Baldwin* v. *Saltee*, 8 *Paige*, 473; *Tyson* v. *Smith*, 8 *Texas*, 147; *Moore* v. *Smedley*, 8 *Paige*, 600; *Smith* v. *Flecks*, 96 *Penn. St.*, 480; *Lowry* v. *Mehaffy*, 10 *Watts*, 387; *McFarson's Appeal*, 1 *Jones*, 503; *Shofstall* v. *Adams*, 2 *Grant*, 209; *Simpson* v. *Breckinridge*, 8 *Casey*, 287; *Ewing* v. *Jordan*, 49 *N. H.*, 457; *Carson* v. *Mulvany*, 44 *Penn. St.* (13 *Wright*), 88; *Richmond* v. *Gray*, 3 *Allan*, 25; *Harley* v. *Brown*, 98 *Mass.*, 546; *Dresel* v. *Jordan*, 104 *Mass.*, 407.

The fact of performance, or offer to perform, by the party seeking relief, makes a contract, coupled with a promise in writing, *signed by the party to be charged*; all that is required in equity to force a compliance on part of defendant. *Dresel* v. *Jordan, supra; Old Colony R. R.* v. *Evans*,

Chrisman v. Partee and wife.

6 *Gray*, 25. Here the contract was signed by parties on both sides *competent to contract.*

The contract bound Mrs. Partee. *In re Jane Hunter*, 1 *Ed. (N. Y.) Ch'y.*, 6. She joined in the deed, brought it into court, and joined in the petition for specific performance.

Hon. JOHN R. EAKIN disqualified. Hon. W. W. SMITH, Special Judge.

## OPINION.

ENGLISH, C. J. Since the appeal in this case Mrs. Partee has departed this life, and her children have been made parties in her stead.

No one can read the pleadings and evidence and fail to be be impressed with the justness of the decree below, sustained as it is by the able opinion of the Chancellor, embodied in the Reporter's statement by direction of this court; and unless the decree is in conflict with some well established and inflexible rule of Chancery law, it should be affirmed. So far as the decree for specific performance rested in the sound discretion of the Chancellor, it was well exercised, and would not be controlled here unless abused.

This was not a contract by Mrs. Partee to convey her lands to appellant in exchange for his city lots, hotel and fixtures. Had she made such a contract, it may be conceded that it would have been void, ( *Wood and wife* v. *Terry et al.*, 30 *Ark.*, 385), for our statutes and constitutions have not so far removed the common law disabilities of married women as to enable them to make valid executory contracts to convey their lands, though prior to the adoption of the present constitution they might convey any interest they had in real estate by joining their husbands in

1. MARRIED WOMEN: Cannot make executory contracts to convey.

properly acknowledged deeds; and now they may convey estates acquired since the adoption of the Constitution of 1874, as if *sole*. *Roberts and wife* v. *Wilcoxon & Rose*, 36 *Ark*., 355; *Ward* v. *Estate of Ward*, *Ib*., 386.

The contract for exchange of the properties was made between Partee and appellant twentieth of December, 1876. It was made on the part of Partee, with the approbation of his wife, and in a few days afterwards he tendered to appellant a deed executed by himself and wife, which had been previously submitted to and approved by him, but which, when so tendered, he declined to accept, for no other reason than that his own wife had declined to relinquish her dower right in the hotel property.

Passing over some minor questions which were properly settled by the Chancellor, we will consider what the counsel for appellant designate as the main proposition in the case :—

2. SPECIFIC PERFORMANCE Husband's contract to convey wife's lands, in which he has no interest.

I.   That the Mosby place, and an undivided interest in the Wildcat tract, which Partee contracted to convey to appellant in exchange for the hotel property, were the *separate property* of his wife; that he had no interest whatever therein, which he could contract to convey, and that he could not make a valid contract to convey his wife's lands.

Mrs. Partee did not hold the lands under any deed or will settling them upon her, to her sole and separate use, but she held them by inheritance from James Mosby, her father; and all of the lands which her husband contracted to convey to appellant had been partitioned to her (subject to Mrs. Mosby's dower right), except the Wildcat tract, in which she held an undivided half interest, her sister, Mrs. Core, owning the other interest.

Mrs. Partee must have acquired the lands before the adoption of the present constitution, and as early as 1870 or 1871, because James B. Core, whose deposition was

Chrisman v. Partee and wife.

taken on the twenty-sixth of September, 1877, deposed that her father's estate was divided between her and her sisters, and each one's portion assigned separately, six or seven years before then.

It does not appear that she ever scheduled the lands.

It may be taken to be true, upon the record before us, that at the time Partee contracted to convey the lands the fee was in his wife, and he had the right to the use of them during coverture, which was a freehold estate, (*Schoulers Dom. Rel. p.* 142), with expectancy of curtesy.

II.   We will next consider the question of MUTUALITY.

After appellant declined to accept the deed jointly executed by Partee and wife, and tendered to him, the bill for specific performance of the contract was filed, and the deed tendered in court.

MUTUAL- ITY.

Here it may be remarked that when the case came on to be heard, the Chancellor discovered that in drafting the deed a clerical error had been made in describing the lands, which neither of the parties had before noticed, and he declined to make a decree, unless another deed correcting the mistake was executed and brought in, which was accordingly done by Partee and wife ; and then decree for specific performance was rendered.

At the time the contract was made Partee had a valuable interest in the lands, but was unable himself to convey the fee, because it was in his wife, as was known to appellant.

Appellant had the fee in the hotel lots, subject to his wife's right of dower.   Neither party to the contract had in his own right power to make a perfect title.   But when the remedy was sought, and the decree for performance asked, Partee was in a condition to deliver to appellant a clear title, as he had contracted to do.

In *Clayton* v. *Ashdown*, 9 *Viner, Abr.*, 393, the contract was made by an infant, and the bill for specific per-

formance brought after he was of age ; and it was objected by defendant that he was bound, when the contract was made, but the infant was not ; and so there was no mutuality ; but the objection was overruled, and the contract decreed to be performed.

So in *Fishmonger's Company* v. *Robinson*, 5 *Manning & Granger*, 131 ; it was held that the parties were mutually bound at the institution of the suit, and that was sufficient, though the plaintiff was not bound when the contract was made.

There are numerous English and American adjudications to sustain the proposition that it is sufficient, if the vendor be able to make a good title before decree pronounced, although he had not a good title when the contract was made. See note to *Rose* v. *Calland*, 5 *Vesey, Jr., Sumner's Edition, p. 189, and cases cited. Hoggart* v. *Scott*, 5 *English Chancery*, 293 ; *Mortlock* v. *Butler*, 10 *Vesey, Jr.*, 292 ; *Wynn* v. *Morgan*, 7 *Ib.*, 202 ; *Hepburn* v. *Auld*, 5 *Cranch*, 262 ; *Dutch Church*, v. *Mott*, 7 *Paige*, 77.

In *Baldwin* v. *Salter*, 8 *Paige*, 474, Chancellor WALWORTH said : "It is a general rule that specific performance of an agreement may be decreed if the complainant is in a situation to perform on his part, and make a good title, when the cause comes before a court for a decree."

See also, *Seymore* v. *Delacy*, *Cowan*, 446 ; *Hepburn et al.* v. *Dunlap & Co.*, 1 *Wheaton*, 178 ; *Moss* v. *Hanson*, 17 *Penn. State*, 382.

Where vendor has no title at time of contract. One who attempts to speculate upon land to which he has no title, and no legal or equitable means of acquiring title, cannot ask specific performance, because he is not a *bona fide* contractor ; but such is not the condition of one whose land had been sold for taxes, and the tax-deed made at the time he contracted to convey it, but the time for redemp-

tion had not expired, and it was in his power to redeem. *Ley* v. *Huber*, 3 *Watts*, 367.

In *Cotton* v. *Ward*, 3 *Monroe*, 313, Chief Justice Boyle said : "The invariable inquiry of a court of equity, when about to pronounce a decree, is not whether the vendor *was* able, at the time he entered into the contract, (to make a good title), but whether he *is* able to do so ; and a purchaser cannot, it is said, insist upon being discharged from his pur-chase upon the master's report of a defective title, if the same is capable of being made good in a reasonable time. (1 *Maddock's Ch'y.*, 349.) The British courts of equity have even gone so far as to give the vendor, on a bill being filed by him for specific performance, time to procure an act of Parliament to perfect his title. *Sug. Vend.*, 252."

In *Ives* v. *Hazard*, *et al.*, 4 *Rhode Island*, 28, the court said : "It is now well settled by authority, that mutuality of remedy, existing at the time of action brought, is all that is required to enable a plaintiff to maintain his action" for specific performance.

*Dresel et al.* v. *Jordan*, 104 *Mass.*, 407, is a strong case.

In Massachusetts a wife may contract to convey her land, with the assent of her husband. The following is a correct abstract of the decision of the Supreme Judicial Court of that State in the case referred to :

"If a married woman makes a written contract in her own name and her husband's, with a third party, for the sale and conveyance to him of land owned in part by her, in her own right, and in part by her husband, their joint exe-cution [and tender] of the deed of the land to the purchaser, before any indication of his intent to repudiate the contract, is a sufficient assent of the husband to the sale of her part of the land, and a ratification by him of the contract for the sale of his part, to entitle them to enforce specific perform-

ance, without evidence of her original authority to enter into the contract in his behalf.''

Justice WELLS, who delivered the opinion of the court, after deciding other questions, said : '' This consideration leads to another objection urged by the defendant, namely : that there is a want of such mutuality as is requisite for an agreement entitled to specific performance.   *   *   *   * The point of the objection is, that the seller must have, at the time the agreement is made, such title and capacity to convey, or such means and right to acquire them, as will enable him to fulfill the contract on his part ; otherwise the court will not hold the purchaser to a specific performance. But we do not so understand the rule.   On the contrary, if the obligation of the contract be mutual, and the seller is able in season, to comply with its requirements on his part, to make good the title which he has contracted to convey, we see no grounds on which the purchaser ought to be permitted to excuse himself from acceptance.   The suggestion of such a rule in *Hurley* v. *Brown*, 98 *Mass.*, 545, was foreign to the case there decided, and is not borne out by the authorities cited,'' etc.

And after reviewing other cases, Justice WELLS added : '' The equitable rule is established by numerous authorities that where time is not of the essence of the contract, and is not made material by the offer to fulfill by the other party, and request for a conveyance, the seller will be allowed reasonable time and opportunity to perfect his title, however defective it may have been at the time of the agreement.   And in all cases it is sufficient for the seller, upon a contract made in good faith, if he is able to make the stipulated title at the time when, by the terms of his agreement, or by the equities of the particular case, he is required to make the conveyance in order to entitle him to the consideration''—citing quite a number of cases.

There was no dissenting opinion, and among the six eminent Judges, then composing the court, was the distinguished jurist Hon. HORACE GRAY, recently appointed an Associate Justice of the Supreme Court of the United States.

The decision was criticised by an article in the American Law Review, (1872), but the writer's name was not given, and we have no means of judging other than from the article itself, of his claims as a lawyer.

In *Jenkins* v. *Hiles*, 6 *Vesey*, 646–655, Lord Chancellor ELDON, remarked: "It is impossible to deny that, upon the old authorities a specific performance might be obtained if the title could be made good before the report. The court would execute the contract then, regard being had to the justice due to particular cases.

And, in the latter case of *Coffin* v. *Cooper*, 14 *Vesey*, 205, Lord ELDON held that if the master report that the plaintiff will have a good title upon getting a term, procuring administration, etc., the court will put him under terms to procure that speedily; and the motion of a defendant to be discharged, because the master reported that a good title could not be made, was refused, the plaintiff having in the meantime obtained an act of parliament to enable him to perfect the title.

These are among the cases reviewed and relied on in the opinion of Justice WELLS.

The contract to convey was not valid as to Mrs. Dresel, because she signed it without the consent of her husband; and it was not binding on him because she signed his name to it without authority; yet, they, in accordance with the contract, joined in the execution of a deed, and tendered it, and on refusal of the purchaser to accept it, they filed a bill for specific performance, and brought the deed into court, and the court decreed performance. There was no mutuality

when the contract was made, but there was when the decree was asked.

In *Richards* v. *Green*, 8 *C. E. Green*, (23 *New Jersey*), 536 ; the husband, Green, went into possession of a house and lot under a parol agreement to purchase of Richards. Afterwards Richards signed a written contract, in which he agreed, with the consent of the husband, to sell the property to the wife, Mrs. Green, for $2,500, and that when $500 and the back rent were paid, he would make her a deed, and take a mortgage for $2,000. The back rent was paid, and a tender of the $500, and of a bond and mortgage for the residue of the consideration money being made to Richards, he refused to convey the premises to Mrs. Green, and Green and wife filed a bill for specific performance. The court refused to decree enforcement of the written contract made with Mrs. Green ; because, at the time the contract was made and at the time the decree was asked she was under the disability of coverture, and unable to perform the contract on her part ; but the court decreed her the title, on the terms tendered, upon the parol contract made with her husband, who was under no disability to contract or perform.

In remarking upon the agreement with the wife, the Chief Justice said : "In every case that I can find, where specific performance has been ordered, a mutual remedy existed upon it at the time of the rendering of the decree. It seems to me that the rule is universal to this extent, that equity will not direct a performance of the terms of an agreement by one party, when, at the time of such order, the other party is at liberty to reject the obligations of such agreement."

And he illustrates the rule by the case of *Flight* v. *Bolland*, 4 *Russ.*, 298, where the plaintiff was an infant when

he made the contract, and was still an infant at the time he asked a decree to enforce its performance.

But in this case the contract was not made with the wife, but with the husband, who was under no disability, and bound by it, and able to perform it when the decree was made, for he had delivered in court a deed executed by himself and wife; he had done what it was understood by appellant he was to do, when the contract was entered into between them.

In *Farley* v. *Palmer*, 20 *Ohio State*, 223, Palmer and wife entered into a written contract to convey to Farley land to which the title was in the wife. At the time of making the contract a deed was executed by Palmer and wife, and placed in the hands of a third person, and by the terms of the contract this deed was to be delivered to Farley upon his paying the stipulated purchase money. Upon Farley's refusal to pay the purchase money and receive the deed, at the time agreed upon, Palmer and wife brought their action for a specific performance. It was insisted for the defense that Mrs. Palmer, being a married woman, was incapable of making the contract, and was not bound by it, and it was therefore, not binding on Farley, for want of mutuality. But she and her husband had executed the deed, and placed it in the hands of the third party, (who was regarded by the court as agent of both parties), to be delivered on payment of the purchase money, according to their contract, and the court decreed specific performance of the contract.

It is difficult to see any difference between that case and this, on principle. Here the husband contracted to make title to lands known to be in the wife; he promptly procured the wife to join him in the execution of a deed, and tendered it to appellant, who declined to accept it on no other ground than that his own wife had refused to relinquish dower in the lots, which he had bound himself by

8–38

the contract to convey in exchange for the lands; and then both husband and wife brought the deed into court, and asked specific performance. With what plausability could it be said that the husband was not able to perform the contract, and that the wife was not bound by it, when both of them had executed and delivered the deed in court, and asked appellant to accept it? On what substantial principle could the Chancellor have refused the decree, dismissed the bill, and left Partee to sue in a court of law for damages for the breach of the contract?

In *Watts, et al. v. Kinney and wife*, 3 *Leigh*, 272, 292, HENRY SAINT GEORGE TUCKER, President of the Court of Appeals said: ''The wife in this case is the essential contracting party, if indeed *she* is to be called a contracting party, who is bound or not bound, at her absolute will and pleasure. But only thus far bound, the other party cannot have been bound, and cannot therefore have been a debtor. Upon this ground also it is probable that no specific performance could properly have been decreed, since the want of mutuality in the contract is generally a valid objection to the exercise of that jurisdiction. (*1 Madd, Ch. Prac.* 423-4.) Certain it is, I think, that no decree should have been rendered against the vendee until the vendor had procured and offered in court a deed executed with all proper solemnities to pass the title of the wife; since otherwise, this solecism is presented, that the decree between the parties is binding or not binding, at the will and pleasure of one of them.''

That is just what Partee did in this case: The deed of himself and wife, executed on her part with all proper solemnities, was brought into court.

In *McCann v. Jane*, 1 *Robinson* (*Virginia*) 256, the husband sold land, in which his wife had an estate in fee, and executed a bond to the purchaser, conditioned that he and

his wife would make a deed to the purchaser within a speci-
fied time. The wife declined joining the husband in the
deed, and forbid him to convey his estate, and he refused
to make any conveyance. Thereupon a bill was filed by
the purchaser against the husband stating that there were
children by the marriage, and that the husband was there-
fore entitled to a life estate, and praying that he might be
decreed to convey to the complainant all his interest in the
land, reserving to the complainant his right of action at law
upon the bond against the husband for failing to procure his
wife to unite with him in the conveyance. A demurrer was
sustained to the bill, and it was dismissed, and the decree
was affirmed by the court of appeals.

In a note the Reporter states that the decree was affirmed
on the ground that a court of equity ought not to sustain a
bill for specific performance as to part, and allow the plain-
tiff to proceed at law for the recovery of damages as to the
residue.

In *Clarke et al.* v. *Reins*, 12 *Grattan*, 98, it was decided
that a court of equity will not decree a specific performance
of a contract by a husband and wife for the sale of the
wife's land, at the suit of the vendee, the wife refusing to
execute the contract. The court did not favor the earlier
English practice of compelling the husband, even by im-
prisonment, to procure the wife's title, as it might create
domestic disturbance, and was contrary to American public
policy.

This is not a case where the vendee is seeking to compel
the husband to procure the wife to convey her title.

On that subject, Judge STORY said: "There is another
sort of contract, respecting which there has been no small
diversity of opinion, whether a specific performance ought
to be decreed or not. It is where a husband covenants that
his wife shall levy a fine, or execute any other lawful con-

veyance to bar her right in his estate, or in her own estate. There are many cases in which covenants of this sort have been decreed to be specifically performed. And, on one occasion Sir Joseph Jekyll, Master of the Rolls, said ' there have been a hundred precedents, where, if the husband, for a valuable consideration, covenants that the wife shall join him in a fine, the court has decreed the husband to do it, for he has undertaken it and must lie by it, if he does not perform it." '

Then, after showing that the later English decisions did not favor this practice, and that it was contrary to public policy in our country, he adds : ·'Where, indeed, there is no pretence to say that the wife is not ready and willing to consent to the act, and that defense is not set up in the answer, but the objections to the decree are put wholly upon other distinct grounds ; there may be less difficulty in making a decree for a specific performance. Even in such a case, a court of equity ought not to decree in so important a matter affecting the wife's interest, without bringing her directly before the court, and obtaining her consent upon full deliberation. But when the answer expressly shows an inability of the husband to comply with the covenant, and a firm refusal of the wife, it will require more reasoning than has yet appeared to sustain the justice or equity or policy of the doctrine." 1 *Story Eq.*, *2d Ed.*, *secs.* 731–735.

In *Luse* v. *Deitz*, 46 *Iowa*, 205, Luse contracted to convey to Deitz a brewery property, which did not belong to him ; but his wife was the owner of it by recorded deed, which was not known to Deitz when he entered into the contract with Luse, and agreed to convey him other property in exchange for the brewery property. Mrs. Luse was not a party to the contract, and in no way bound thereby. Luse tendered a deed executed by himself and wife to Deitz, who refused to accept it, and Luse brought an action of specific

performance. The decree was refused on the ground of want of mutuality at the time the contract was made. It seems that Luse had no interest in his wife's brewery property—nothing that he could contract to convey.

To sustain the proposition that mutuality must exist at the time the contract is made, Chief Justice DAY quoted *Section* 286 *of Fry on Specific Performance of Contracts*. But in *sec.* 154, the same author said : '' The incapacity to contract, and the incapacity to execute a contract, are of course different questions ; the one must be judged of at the time of the contract, the other when its performance is sought.

In *Leading Cases in Equity, White & Tudor, vol.* 2, *part* 2, *p.* 1101, it is said : ''The language held in *Green* v. *Richards.* (*sup.*) implies that a specific performance may be decreed at the instance of a complainant who is *sui juris,* although she was under the disability of coverture at the time of entering into the agreement, because the institution of the suit supplies the mutuality which was wanting in the first instance. A like principle was applied in *Clayton* v. *Ashdown,* 9 *Viner Abr.* 393, in favor of an infant who became of age before the filing of the bill. The conclusion may be at variance with the doctrine held in other instances, that a contract will not be specifically enforced unles it was binding when made. *Ante.* 1099, *Hooner* v. *Calhoun,* 16 *Grattan,* 109 ; but it is sustaiued by the weight of authority and by principle ; see *The Fishmonger's Company* v. *Robinson,* 5 *M. & G.,* 131.''

In *Coldcleugh* v. *Johnson, admr., et al.* 34 *Ark.,* 316, where the fee was in a *feme covert,* and a bond for title given by her and her husband, and the purchaser had gone into possession and paid part of the purchase money, it was held that if the deed of the husband and wife was tendered, or the deed of the wife, if she had become discovert, the

purchaser could not defeat the bill for specific performance· on the ground of want of mutuality at the time the bond for title was made.

*Turner* v. *Baker*, 30 *Ark.*, 195, is not in point. There, as said by Bro. HARRISON: "As the contingency upon which the assent of the parties depended, never happened, there was no contract," etc. See on the subject of mutuality in suits at law, *Drennen* v. *Boyer & Clark*, 5 *Ark.*, 497.

*Rogers ad.*, v. *Brooks*,, 30 *Ark.*, 612, was ejectment by the husband as administrator of the wife, and by cross-bill defendant sought specific performance. On page 627 the Chief Justice said: "Rogers could not bind his wife or her heirs by contract to convey the legal title to any part of her lands. It is probable, from the evidence, that Mrs. Rogers in her lifetime, knew of the contract between her husband and Brooks, and was satisfied with the division line, which seems to have been agreed upon between them. But this did not entitle Brooks to enforce a specific performance of the contract as against her or her heirs. She could only bind herself or her heirs by a deed of conveyance, executed according to the forms prescribed by law, and this Brooks failed to obtain, *Wood and wife* v. *Terry et al.*, *ante*, and cases cited."

There the wife was dead when the remedy was sought, and had not bound her heirs. Here Mrs. Partee was living, joined her husband in the suit, and they tendered in court, as they had done before suit, a joint deed for the lands which the husband had, with her approbation, contracted to convey, and which appellant had declined to accept for no other reason than that his wife had refused to relinquish dower in the lots, which he had agreed to convey in exchange for the lands ; and this was waived, and no compensation asked in the bill, or taken by the decree for the value of the dower right.

Chrisman v. Partee and wife.

The truth of the whole matter, from the evidence, is, that appellant changed his mind, and concluded to make a child's bargain of it; and attempted to defeat the bill for specific performance by the defense of want of mutuality, when he and Partee, both *sui juris*, entered into the contract.

Our conclusion upon the question of mutuality, which we think is sustained by the weight of authorities, may be formulated thus:

Where the husband, having use during coverture of the wife's lands, contracts to convey them with her approbation, to one who knows that the fee is in the wife, and husband and wife promptly join in the execution of a deed and tender it to the purchaser, and he, for no good reason, declines to accept, and they join in a bill for specific performance and tender a good deed in court, and the Chancellor decrees performance, the decree should not be reversed on appeal.

Some of the minor points made here for appellant are not founded on the facts in evidence, and others were as indicated above, well answered by the opinion of the Chancellor.

Decree affirmed.

W. W. Smith, Sp. J., dissenting. I doubt the propriety of granting specific performance in any case where a man has undertaken to sell his wife's lands, for the reason that the remedy is not mutual. And by mutuality I understand that the contract must be such that it might at the time it was entered into have been enforced by either of the parties against the other. Now, if Partee had been reluctant to complete this exchange, or his wife had refused to be bound by her husband's agreement, it is obvious that Chrisman could have had no decree for specific execution. My opinion is that Partee should be left to his action for damages.