## GREGORY et al. v. KEENAN.

### (District Court, D. Oregon. March 10, 1919.)

### No. 7334.

1. VENDOR AND PURCHASER ⚖=76, 130(1)—CONSTRUCTION OF CONTRACT.

Contract for the sale and purchase of land *held* to entitle the purchaser to a marketable title, and to make the acts of final payment and conveyance concurrent.

2. PUBLIC LANDS ⚖=114(5)—OREGON DONATION LANDS—PERFECTING OF TITLE AFTER DEATH OF SETTLER.

A settler on public land in Oregon *held*, on the evidence, to have completed his residence to entitle him to patent prior to his death in 1855, so that under the statute the land was subject to sale by his administrator for payment of his debts, in proper proceedings, although patent was subsequently issued to his heirs at law.

3. EXECUTORS AND ADMINISTRATORS ⚖=337—SALE OF LANDS—NOTICE TO HEIRS.

Where the statute required notice to the heirs at law of an intestate decedent of proceedings to subject his real estate to payment of his debts, a proceeding and sale on published notice "to whom it may concern," although the heirs were named in the petition, *held* void, and the defect not curable by retroactive legislation.

4. PARTNERSHIP ⚖=252—PARTNERSHIP ADMINISTRATION—PARTNERSHIP LANDS.

Under L. O. L. § 1168, the administrator of a partnership estate has power to sell lands owned by the partnership for the payment of partnership debts, although the title is in the names of the individual members.

5. EXECUTORS AND ADMINISTRATORS ⚖=378—SALE OF LAND—IRREGULARITIES IN PROCEEDINGS—CURATIVE STATUTE.

Mere irregularities in proceedings by an administrator for the sale of land, which do not affect substantial rights of the heirs, may be remedied by curative legislation.

6. VENDOR AND PURCHASER ⚖=117, 122—RESCISSION OF CONTRACT BY PURCHASER—CONDITION PRECEDENT.

A party is not permitted to rescind a contract for the purchase of realty, and at the same time keep possession of all or any part of the land bargained for, but must proffer its return, so as to put the vendor in statu quo.

---

⚖=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. VENDOR AND PURCHASER &#9737;&#8594;117—RESCISSION OF CONTRACT BY PURCHASER—TENDER OF POSSESSION.

    A tender of a deed by a purchaser to the vendor of land is not equivalent to a tender of possession for the purpose of a rescission.

8. QUIETING TITLE &#9737;&#8594;12(1)—VENDOR AND PURCHASER &#9737;&#8594;144(1)—CONTRACT OF SALE—TITLE OF VENDOR.

    Decree, in a suit by a vendor of land under contract to convey on full payment of the price, brought while the purchaser was in possession, and quieting the title in plaintiff, *held* sufficient to render the title marketable within the terms of his contract.

9. VENDOR AND PURCHASER &#9737;&#8594;144(2)—SUIT TO FORECLOSE CONTRACT—DEFECTIVE TITLE.

    Where the vendor brings suit to foreclose a contract for the sale of land, in which defendant pleads defective title, when time is not of the essence of the contract, or delay has been the fault of the defendant, complainant may clear up defects in the title at any time before final decree.

In Equity. Suit by W. J. Gregory and others against S. A. Keenan. Decree for complainants.

F. J. Newman and A. E. Reames, both of Medford, Or., for plaintiffs.

Jenkins & Crawford, of Portland, Or., for defendant.

WOLVERTON, District Judge. On May 6, 1911, the defendant, S. A. Keenan, advanced $250 earnest money for the purchase of 140 acres of land situated in Jackson county, Or.; Huntley-Kremer Company representing the vendors. It was a condition of the contract then entered into respecting the purchase of the land by Keenan that, as soon as the title was found to be good by the purchaser and the soil satisfactory, Keenan should pay the balance of the purchase price in manner stipulated. The title was to be retained by the vendors, and Keenan agreed to accept a bond for a deed, which was to operate between the parties as security for deferred payments, the title to be conveyed when payment was fully met. The agreement contained a further provision to the effect that the purchaser should have 10 days after receipt of abstract of title to pay the balance of the first installment agreed to be paid for the land.

Prior to this time, namely, on February 25, 1909, the plaintiff W. J. Gregory, who held the title to the land, and his wife, Elizabeth Gregory, gave to the plaintiffs W. W. Glasgow, Charles M. English, and J. A. Bothwell a bond for a deed, whereby Gregory agreed to sell the property to them, in pursuance of which he let them into possession.

On May 20, 1911, a further agreement was entered into with reference to the sale of the land to Keenan, wherein Gregory and wife are styled the parties of the first part, Glasgow, English, and Bothwell and their wives parties of the second part, and Keenan party of the third part. By the terms of the agreement, the second parties waive their right of purchase under the bond for a deed from Gregory, and the first parties agree to sell and convey the premises to Keenan for the sum and price of $20,000, to be paid in manner following: $5,000 down, $3,000 on or before May 20, 1912, and the balance of $12,000

on or before May 20, 1916, with interest at 6 per cent. per annum. The agreement, among others, contains this clause:

"Now, if the sums of money herein promised to be paid by the party of the third part herein shall, time being strictly the essence thereof, be by him well and truly paid, strictly at the time and in the manner herein promised by him, then upon the full and complete performance of each, every, and all of said payments, together with the annual interest thereon, then the parties of the first part herein and the parties of the second part herein do hereby undertake, agree, and promise that the parties of the first part herein will forthwith make, execute, and deliver to the party of the third part herein a good and sufficient deed of general warranty, conveying all of said property to said party of the third part herein, free from either lien or incumbrance of any kind or nature."

In default of prompt payment, foreclosure is provided for. Until date of default, it is stipulated that Keenan shall have possession of the property, and it is further agreed between the parties that Keenan should cause the land to be subdivided into 5-acre tracts, and these it was his right to sell as he might find purchasers. When sold, the tracts were to be deeded, either to Keenan or to the purchasers, upon condition that Keenan should pay upon the purchase price of the land at the rate of $150 per acre of the tracts so sold. In this relation the first parties covenanted to convey the tract or tracts so sold by "good and sufficient deed," and to "do and perform each and every act and thing that may be either necessary or requisite to be done in the premises, so that full and complete title to said 5-acre subdivision shall be transferred * * * free from either lien or incumbrance of every kind and nature and especially free from the operation of this contract." Then follows the stipulation:

"And as between all of the parties hereto it is further expressly agreed and understood that the title to all of the property herein described is at this time in the parties of the first part herein, and that their general warranty deed shall have the effect of conveying and passing full and complete title to any of said subdivisions of land so paid for by the party of the third part herein."

The defendant, Keenan, having failed to pay the last installment of $12,000, and certain taxes, as provided for in the agreement, the plaintiffs, on December 2, 1916, instituted this suit to foreclose the contract.

On December 16, 1916, Keenan wrote Glasgow, indicating a wish to take up the balance due on the contract, and asked for a statement of the amount necessary to discharge the obligation. The amount claimed, namely, $14,316, was, on December 20th, communicated to Keenan by letter, and he was informed that the suit would be stayed until January 2, 1917, until which time he could avail himself of the offer made to accept payment. On December 22d Keenan wrote as follows:

"I have your letter of the 20th inst. concerning the land contract. I note that you and your associates are willing to carry out the terms of the contract and to execute the necessary conveyances which, with the abstract of title continued down to date, will disclose a perfect title to be transferred to me. I also note that you will procure a deed from all the parties to the contract and that you fixed January 2, 1917, as the expiration of your offer.

In order that there may be no mistake or misunderstanding, I am mailing the inclosed formal notice to all the parties to this contract.

"I expect to be in Medford at the time designated myself, and will want the transaction closed up at that time without any further delay or misunderstanding, so please have your deeds and the abstract of title all ready."

The meeting took place, at the place and on the day indicated, which resulted in Keenan's disapproval of the title offered by Gregory and his co-complainants, and an attempted rescission on his part of the contract to convey, and a demand for the repayment of the amount of the purchase price and some taxes previously paid.

Thereafter Keenan answered, setting up that Gregory was without good and sufficient title to the land, and was unable to convey the same in fee simple, free and clear of incumbrances, as called for by the agreement, and prayed a decree for rescission of the agreement and recovery of the amount of the purchase price and taxes theretofore paid in pursuance of the contractual relations of the parties.

The chief grounds of defense relied upon by the defendant for defeating the suit to foreclose are:

First, that the plaintiffs have not proffered a marketable title to 43.9 acres included in the tract of 140 acres agreed to be conveyed. The acreage alluded to is a part of the donation land claim No. 37 of James A. Lupton.

Second. Nor have they proffered a marketable title to 36.1 acres, being all of lot 2, derived from the Angle and Plymale estate.

Third, that the deed from A. Childers et al. to William Angle and F. M. Plymale was insufficient to carry title; and—

Fourth, that certain quitclaim deeds found in the chain of title are insufficient, because of the simple fact that they are quitclaim deeds, to convey a marketable title such as was contracted for by the defendant under the agreement to convey.

[1] Previous to a discussion of these objections to the plaintiffs' title, it is essential that we dispose of a contention urged by plaintiffs, which, if sustained, is preclusive of any defense that the defendant might make on account of the condition of the title in plaintiffs. The point is that, by the condition in the agreement to the effect that the title to all the property was at the time of entering into the agreement in the parties of the first part, that is, W. J. Gregory and wife, and that a general warranty deed from them should have the effect of conveying and passing full and complete title to any of the subdivisions into which the land was to be divided, precludes the defendant from now asserting that the title proffered was not a good or marketable one. The solution of the controversy depends upon a proper construction of the agreement.

Elsewhere in the agreement, as is shown above, the parties of the first and second parts undertake and agree, upon the payments being made as stipulated, that the parties of the first part shall forthwith make, execute, and deliver to Keenan a good and sufficient deed of general warranty, conveying all the property, free from either lien or incumbrance of any kind or nature. And later, speaking with relation to the 5-acre subdivisions, it is further stipulated that the parties

of the first part shall make, execute, and deliver to the vendee a good and sufficient deed conveying the specific subdivision of land, and shall do and perform each and every act and thing that may be either necessary or requisite to be done in the premises, so that a full and complete title shall be transferred. These are stipulations that occur in the agreement previous to the one upon which plaintiffs rely for precluding the defendant from questioning the title.

It is a canon of interpretation that all clauses in a contract shall stand and subserve their obvious purpose, unless in palpable conflict with or incongruous to some other clause that renders them nugatory. In other words, the agreement must be so construed, if possible, as to give meaning and effect to all its provisions. Applying the rule, we find no difficulty in construing these several stipulations of the agreement.

When dealing with the subject of sale and conveyance to Keenan, or of the subdivisions, a warranty deed is stipulated for conveying a fee-simple title, free and clear of incumbrances, and thus it was intended that the vendee should have a marketable title. Were it not for the clause relied upon by plaintiffs, there could be no question as to the correctness of this construction, and yet, when the true purpose of the clause is considered, there is left no incongruity. The second parties previously held a bond for a deed to the property, and therefore had some interest in it. This interest they were waiving, so that the title might be conveyed to Keenan. Gregory held the legal title. Therefore, in order that the second parties might not still insist upon holding their interest, it was stipulated by and between all the parties to the agreement that Gregory and wife held the legal title, and that a warranty deed from them would convey whatever title the parties of the first and second parts had in any of the subdivisions to which it was applied.

I am impressed that it was not intended thereby to mutually covenant that Gregory held the absolute fee-simple title, free from incumbrances, or that his title was the marketable title elsewhere covenanted to be conveyed to Keenan. This construction renders the agreement entirely harmonious, and is obviously the one that was in the minds of the parties when the agreement was executed. The previous contract with Keenan was altogether merged into this agreement. Although Keenan may have had the abstract of title in his hands at the time of entering into the later agreement, he had probably never examined it and it is fair to assume that he depended upon the covenants of the agreement for conveyance of a marketable title.

Another suggestion of construction is tendered relative to whether the act of final payment on the part of Keenan and the act of conveyance on the part of the other parties to the agreement were independent or concurrent covenants. I construe the agreement as rendering them concurrent. The time of payment is made of the essence of the agreement, but upon payment, as stipulated, the first and second parties covenant to forthwith make, execute, and deliver the deed of general warranty. This renders the acts concurrent, which was no doubt the purpose of the parties, and the agreement must be so interpreted.

We now return to defendant's objections to the title, and first as it pertains to the Lupton land. This land is, as has been indicated, a part of the James A. Lupton donation land claim. The patent bears date August 8, 1866. It recites the fact of the issuance by the register and receiver at Roseburg, Or., of certificate No. 984, from which it appears that under the provisions of the act of Congress approved September 27, 1850 (9 Stat. 496, c. 76), and legislation supplementary thereto, the claim of the heirs at law of James A. Lupton, deceased, notification No. 7, has been established as a donation land claim of one-half section, or 320 acres, of land, and that the same has been surveyed and designated as claim No. 37, whereon is predicated a grant to the heirs. The land is described by metes and bounds, from which it appears that the survey was made upon lines running east and west and north and south.

[2] This claim was sold at administrator's sale by the administrator of the estate of James A. Lupton, deceased, and the strong contention of counsel is that the land was then not the property of Lupton's estate, but the property of his heirs at law, and that his administrator was without power or authority to sell it to satisfy his debts, or for any purpose.

From the abstract of title, the record shows that Lupton died October 8, 1855, and that he left as his heirs at law two sisters, namely, Elizabeth McLaughlin, of Pennsylvania, and Margaret Holmes, of St. Louis. The sale of the real estate was consummated on November 12, 1859, and was confirmed December 5th following. This, it will be perceived, was all accomplished prior to the issuance of the patent. Gregory claims title through the administrator's sale, and the crucial question is whether the land was subject to sale to satisfy Lupton's debts. This depends, in my opinion, upon whether Lupton died prior to having resided upon the donation for the full period of four years after settlement, or subsequent to the expiration of that period. The evidence bearing upon the subject is meager, and much is left to inference and presumption.

The Donation Act, approved September 27, 1850 (9 Stat. 496, c. 76), granted to every white settler or occupant of the public lands then residing in the territory of Oregon, or having become a resident thereof before the 1st day of December, 1850, "and who shall have resided upon and cultivated the same for four consecutive years," one-half section, or 320 acres, of land, if single, and if married, or having become married within one year from December 1, 1850, one section, or 640 acres, one half to himself and the other half to his wife, to be held in her own right, the surveyor general to designate the part inuring to the husband and the part to the wife.

By section 5 of the same act, there was granted to every white male citizen of the United States, above the age of 21 years, settling in said territory between the dates of December 1, 1850, and December 1, 1853, and having complied with the section of the act next preceding, one-quarter section, or 160 acres, of land, if a single man, and if married, or having become married within one year after reaching the

age of 21 years, one half section, or 320 acres, one half to the husband and the other half to the wife.

By the sixth section of the act, the settler was required, within three months after survey was made, or, if survey had been made before settlement commenced, then within three months after settlement, to notify the surveyor general of the precise tract claimed, the same to be in a compact form; also to be, as nearly as practicable, according to legal subdivisions, but, where that could not be done, the surveyor general was to survey and mark the claim with boundaries. It was provided, however, that after December 1, 1850, all claims should be bounded by lines running east and west and north and south.

By section 7 the settler was required, within 12 months after survey, or, when survey had been made, within 12 months from time of settlement, to prove to the satisfaction of the surveyor general settlement and cultivation as required by the act, specifying the time when commenced, and at any time after the expiration of four years from date of settlement, upon proper proofs, he was entitled to a certificate from the surveyor general, which likewise entitled him to a patent from the government to the land, upon surrender of the certificate.

By section 8, upon the death of a settler before the expiration of four years' continued possession, all the rights of the deceased descended to his heirs at law, including the widow, where one was left, in equal parts, and proof of compliance with the conditions of the act to the time of death entitled the heirs to the patent.

The certificate, as appears from the patent, was issued by the register and receiver at Roseburg, Or. These officers were authorized to be appointed by the President by act of Congress of July 17, 1854 (10 Stat. 306, c. 84); which was supplementary to the Donation Act, and not before it. The certificate is not in evidence, and we only know of its contents by such reference as is made to it in the patent. Lupton, in all probability, was not a married man at the time he made settlement, and so notified the surveyor general. Otherwise we must assume that some note of the fact would have been made in the certificate, and consequently in the patent. None such appears in the latter document. Not being a married man, he must have made settlement in pursuance of section 4 of the act of September 27, 1850; for otherwise he would have been entitled to one quarter section only, and not to a half section, as the certificate of the register and receiver shows was his right. So we must conclude that Lupton was either a settler and occupant of his donation at the time of the passage of the act, and made declaration thereof prior to December 1, 1850, or that he became a resident of the territory and a settler upon the land some time prior to December 1, 1850.

This result seems logically to follow from a proper interpretation and application of the provisions of the act, and we must assume that the officers of the land office acted in discharge of their functions of office. Such being the case, Lupton's four years' settlement and cultivation must have expired some time prior to December 1, 1854. Having died October 8, 1855, he had therefore completed such resi-

dence and occupation prior to his decease. It must be true, however, that the heirs at law made the final proofs, and that they did this after his death, as otherwise the certificate would have shown that Lupton was entitled to the patent, and not the heirs. The only item of evidence that would seem to indicate that Lupton's settlement was made subsequent to December 1, 1850, and not prior thereto, is the manner in which the survey of his claim was made by lines running east and west and north and south, and this may have been a mere coincidence.

We may now determine what was the effect of the issuance of such certificate and patent to the heirs, rather than to Lupton.

Section 4 of the act contains a provision rendering void all further contracts for the sale of the land to which the donor is entitled before receipt of his patent. This provision was repealed by the act of July 17, 1854, and it was declared that no sale should be deemed valid unless the vendor had resided four years upon the land. The Supreme Court has construed the legislation to mean that:

"After this prohibition was taken away, the system was radically changed, and a perfected right to a patent was made as good as the patent itself for all purposes, except the mere convenience of proving title." Barney v. Dolph, 97 U. S. 652, 658 (24 L. Ed. 1063).

And the court goes on further to say of the amendment:

"A grant by Congress, under these circumstances, of the right to sell the land, must have been intended to authorize those entitled to patents to convey in the same manner they could if the patent had been actually delivered. Any provision in the act transferring the title of the settler, in case of his death before receiving the patent, to his child, heir, or devisee, is palpably inconsistent with an unlimited power to sell and convey the land."

Some time previous to this decision by the Supreme Court, it was distinctly held by the Supreme Court of Oregon that, after four years of residence, the settler possessed an estate in fee in his land claim, which he could sell and convey to another before obtaining his patent, and that his heirs, on receiving the patent after his death, would be bound by his deed, and that they took the patent subject to such sale by the settler. Ramsey v. Loomis, 6 Or. 367, 377–8.

It follows, quite naturally and logically, that if, after four years' settlement and cultivation, the settler took a fee-simple estate in his donation land claim, he possessed such an estate as could be subjected to the payment of his debts and obligations, at least such as may have accrued subsequent to the expiration of the period of four years' settlement and cultivation. His administrator would therefore be authorized to sell his fee-simple estate, with a view to discharging such debts and obligations. We must assume, on this collateral proceeding, without else being shown, that the debts were such that the land could be properly subjected to their payment.

Lupton's administrator being so authorized to sell his donation, the next question presented is as to the sufficiency of the sale.

The petition for the sale is amply sufficient. But it is objected that there was no sufficient publication of notice to the heirs. It appears that the heirs were nonresidents of the state; hence it was nec-

essary that they be served with the citation by publication. At the time the transactions took place, the law required that, upon filing the petition for order of sale of the real property, a citation issue to the devisees and heirs mentioned in the petition to appear at a term of court specified, not less than ten days after service of the same upon them, to show cause, if any exist, why the order of sale should not be made as prayed for. Upon an heir or devisee resident within the state the citation was required to be served and returned as a summons; but upon a nonresident it was provided that service should be made by publication thereof of not less than four weeks, and such further time as the court might direct, the published citation to contain a brief description of the property described in the petition. Sections 1115 and 1116, General Laws of Oregon 1845–1864.

The petition for sale appears, from an abstract of title which has been submitted in evidence, to have been filed on October 7, 1859. Proof of the publication of the order of sale was filed, and the order of sale itself was entered, all on the same date. The proof shows four weeks' publication, beginning with the 10th of September, 1859. The publication consisted of an order of the county court, addressed "To Whom It may Concern," which order reads as follows:

"It is ordered by the county court of Jackson county, Oregon, that all persons interested in the sale of the real estate of James Lupton, deceased, late of said county, appear before the said court, on the first Monday of October, 1859, at the courthouse in Jacksonville, to show cause why an order shall not be granted to O. D. Hoxie, administrator of the estate of said James Lupton, deceased, to sell so much of the real property of the said decedent as shall be requisite to pay all debts, charges, and allowances remaining unpaid.

"Sept. 8, 1859."

It will be noted that the order to show cause was made practically one month before the petition for sale of the real property was filed; whereas, such an order, or a citation directing the heirs to show cause why sale should not be made, should have been predicated upon the petition, and not anticipated it, as it appears to have done. Further than this, the statute required that the citation should be to the devisees or heirs. This order, or citation, if such it be called, was directed "To Whom It may Concern," and not to the heirs that the petition shows were the heirs of deceased. So that in no way in which the document may be construed does it conform to the direction of the statute that it be issued to the devisees or heirs, and the proceeding for the sale was, on this account, a nullity, and the sale is inoperative and of no effect, unless it is aided and rendered valid by some one of the curative statutes of the state.

[3] It is the contention of counsel for plaintiffs that the title is rendered valid by the curative legislation of 1907 (section 7156, Lord's Oregon Laws) and of 1913 (Session Laws 1913, pp. 752, 753). Such legislation is regarded as constitutionally valid and operative so long as it does not attempt to infuse life into a proceeding utterly void for want of jurisdiction. It was so declared by the Supreme Court of the state in Fuller v. Hager, 47 Or. 242, 83 Pac. 782, 114 Am. St. Rep. 916.

The principle involved has quite recently received very careful and able consideration at the hands of the same court in Stadelman v. Miner, 83 Or. 348, 155 Pac. 708, 163 Pac. 585, 983. It was there held, in effect, that because real property under the laws of the state descends directly to the heirs at law, notwithstanding it is incumbered by the debts of the decedent, the heirs at law could not be deprived of their property right without notice and a chance to be heard; in other words, that a sale by an administrator of decedent's real property to pay the debts of the estate, without notice to the heirs, would be tantamount to taking the heirs' property without due process of law. To the suggestion that the Legislature has the power to adapt sales of decedent's real property to proceedings in rem, and thus dispense with notice to the heirs, actual or constructive, other than is necessary and requisite to a legal and sufficient sale in rem, and therefore that it has the power to do subsequently by curative legislation what it could lawfully have done primarily, it was answered, and quite sufficiently to my mind, that it had not dispensed with notice to the heirs, and hence that any sale of decedent's property without such notice was nugatory and void.

While on a subsequent hearing it was decided that the conclusion reached, as applied to the facts in that case, the heirs having had the required notice, but that the order of sale had been prematurely entered, could not be maintained, I do not understand that the principle announced was at all departed from, or even criticized. So I am impressed that a sale, without notice to the heirs substantially as prescribed by statute, is not such an irregularity as may be cured by retroactive legislation. If such were the case, the heirs could derive but little protection from the statute enacted especially for their benefit.

To apply the principle here, we find that the Lupton heirs had practically no notice at all, to say nothing of the palpable irregularities attending the making of the show-cause order, the serving of the same, and the entry of the order of sale. The notice or citation, or whatever it may be called, was directed "To Whom It may Concern," and not to the heirs named in the petition for sale. Such a lack of notice the Legislature was without power to cure by retroactive legislation, and the heirs could not be deprived of their day in court by such a legislative fulmination.

Plaintiffs were therefore, according to the abstract of title, without marketable title to the 43.9 acres of the Lupton donation.

[4] A different aspect is presented as it respects the 36.1 acres, or the Angle and Plymale tract. The objection to the title to this tract is that the administrator of the estate of the copartnership of Angle and Plymale was without power to sell the real estate. because the title stood in the names of the individual members of the firm, and that the Plymale heirs were not sufficiently served with citation.

Under the statute, the powers and duties of the administrator of the partnership estate extended to its settlement generally. Section 1168, Lord's Oregon Laws. The petition for sale shows that the partnership estate was the owner of this land; and, it being the owner, the land was subject to sale for payment of the partnership debts.

There exists no good reason why the administrator of such estate may not sell the real property of the estate for the payment of the debts, although the real property stood in the name of the individual members of the partnership. It was the property of the partnership estate, nevertheless.

[5] It is further objected that the order to show cause was served, and not a citation. This order contained all the elements of a citation, however. It directed the heirs to show cause why the order of sale should not be made, and the service had was for the requisite time prescribed by the statute. This included the Plymale as well as the Angle heirs, and indeed all persons to be affected by the proposed sale, as shown by the petition.

It is hardly conceivable how the heirs, or any of them, could have been affected injuriously by reason of the service of the order to show cause upon them, instead of a technical citation. The warning to them was the same as it would have been, had a citation been regularly served upon them, and they had ample notice as to how they would be affected by failure to answer the petition.

Another objection goes to the regularity of the service. The sheriff's return shows service on the adults "personally and in person," and on the minors by leaving a true copy of the order with Cassie Nicholson, she being over the age of 14 years and a resident of the same house with them, in person. Neither service is good, and if the return had been properly brought to the attention of the court in that proceeding, the court would undoubtedly have required an amendment of the return, if the facts warranted, but, if not, then a reservice. But the service was not so elementarily bad as that it may be said there was no service. There was, in fact, a service of the order, and that service was for the length of time required by the statute. So the heirs did have notice, and reasonable notice at that. The irregularity is simply one respecting the manner of service, and one I am firmly impressed the Legislature was authorized to remedy by curative legislation, and has remedied by the legislation herein before noted. So, also, has it remedied the irregularity touching the service of the show-cause order, instead of a technical citation, and other irregularities respecting the administrator's sale of the Plymale interest in the Plymale and Angle tract.

The abstract, therefore, shows a good, merchantable title to this tract of 36.1 acres.

As to the A. Childers conveyance, it appears that James S. Howard and wife, the original patentees of lot 2, being the 36-acre tract, deeded to A. Childers and son. Later A. Childers and Sarah Childers, his wife, and Spencer Childers and Mary Childers, his wife, executed a deed to Wm. Angle and F. M. Plymale. This is the deed that defendant objects to as insufficient to convey a good title, on the ground that it is not shown that Spencer Childers is the person to whom the Howard deed was made as the son of A. Childers. Spencer Childers, however, has executed an affidavit which shows that he is such person, and, although it was executed out of court, it is prima facie sufficient proof of the fact. The deed from A. Childers and Spencer

Childers and their wives was therefore ample to convey the title to Angle and Plymale, and the objection thereto is without merit.

The objection made that quitclaim deeds are insufficient to convey a fee-simple title is also without merit. They pass all the estate which the grantor could lawfully convey by deed of bargain and sale. Section 7102, Lord's Oregon Laws. Nor is the term "heirs," or other words of inheritance, necessary to create or convey an estate in fee simple. Section 7103, L. O. L.

The next phase of the controversy relates to the attempt on the part of Keenan to rescind the agreement, so as to put him in a position to demand back the money theretofore paid in pursuance of the agreement. Unless Keenan made proper tender of the money due plaintiffs under the agreement, and also due tender of the return of the possession of the land, so as to put plaintiffs in statu quo thereto, he was not in a position to insist upon a rescission.

It may be questionable whether there was a legal tender of the money in the form in which it was made. There was no handing out of the money, or any offer of a check representing it. Keenan simply declares that he had the money on his person at the time, and was able, ready, and willing to perform. But, this aside, I will pass to the tender as it pertains to the possession of the land.

[6] A party is not permitted to rescind a contract for the purchase of realty, and at the same time keep possession of the whole or part of that which was bargained for. He must proffer a return of what he has received, so as to place the vendor in statu quo, before he will be entitled to a return of his purchase money, or any part of it. This is equitable, and, as a rule, it is settled by adequate authority. Vaughn v. Smith, 34 Or. 54, 57, 55 Pac. 99; Sievers v. Brown, 36 Or. 218, 56 Pac. 170; Livesley v. Muckle, 46 Or. 420, 80 Pac. 901.

That Keenan went into possession of this land is not disputed; and that he platted it into 5-acre subdivisions, with avenues running between them dedicated to the public for road purposes, is also conceded. But Keenan claims that he settled with his tenants, obtained a release from them, and turned the property back to the plaintiffs, or, to use his language in his testimony, "offered to turn it back." On cross-examination he says, in effect, that plaintiffs demanded possession of the property, but not from him; that he was not present when possession was demanded, and knew nothing about it personally.

H. L. Gregory, who was a lessee from Keenan, testified, in substance, that some time in the fall of 1916 Newman, one of the attorneys for plaintiffs, came out to his place and demanded possession of the land, and that after such demand was made he gave up possession, which was about the same time demand was made. On cross-examination by Mr. Newman, he was asked:

"So I did not demand that you give up possession; I simply asked you whether I should make you a defendant in order to litigate your rights under the lease?"

To which he answered, "Yes, sir."

Note that this transaction of which Gregory speaks was some time in the fall of 1916. He probably did not surrender possession to plain-

tiffs in the fall of that year, as possession was eventually surrendered by him to Keenan, by formal written release of date December 18, 1916. From that time on possession was in Keenan. This disposes of the claim that Gregory surrendered possession to plaintiffs.

Keenan says, as previously stated, that he "offered to turn it [the land] back." He does not say when. It must have been, if at all, after December 18, 1916, and before January 2, 1917, or upon the latter date. There is no pretense that he made the offer prior to January 2, 1917. Did he make such an offer at that time? There were five persons present on that date, namely, Newman, Glasgow, W. W. Gregory, Keenan, and Conner. Keenan testifies that, after Newman had presented him the abstract and tendered deeds to the land:

"I told him I could not accept them, and I tendered to him the deed to this property back to the plaintiffs, and demanded the return of the money which I had paid, and I rescinded the contract and would insist upon the money being refunded to me, and I also tendered him back the possession—absolute possession of the property and demanded the return of my money."

Later the defendant says:

"I still think the plaintiffs will have a hard time getting possession unless they pay me back the money they got."

So it appears that Keenan's tender of possession of the land, if he made any, was, according to his own testimony, conditional upon his being paid back the money he had advanced.

Mr. Conner was asked:

"What was said—what did Mr. Keenan say—about delivering back the possession of the property, if anything, after he refused to accept the title that they offered?"

To which he answered:

"As I remember it, he stated that the property was theirs, and that he would give them the deed whenever the money was repaid to him."

On cross-examination he was further asked:

"Well, you did not understand, from anything that occurred there at the bank, that he was going to give up possession unless they gave him his money back, and interest, and took his deed, did you?"

To which he answered:

"I understood, from what transpired there, that he claimed that they were the owners of the property, and that he would simply keep charging up interest against them on all moneys that he had paid out previously."

According to witness, this was all that was stated on the subject at that conversation at the bank on January 2d.

W. W. Gregory, after relating what was said at the bank, says positively that nothing was said in that conversation about tendering back the possession of the property.

Mr. Newman was the principal participant with Keenan in the conversation at the bank. After relating the conversation as he understood and remembered it, he was asked:

"Was there anything said in the conversation at the bank, on either side, about the possession of the property?"

256 F.—61

To which he answered:

"Not to my knowledge; no, sir. * * * To the best of my knowledge, there was nothing said about possession, either by one or the other, excepting with reference to what I have said about his being in possession of the property."

Glasgow asserts that there was nothing said during the conversation about possession of the land.

[7] From a careful survey of the testimony of these witnesses, the clear weight would seem to be in favor of the plaintiffs, and that Keenan did not tender the possession of the land at that time, or at all, to plaintiffs, or to any one for them. A tender of the deed can hardly be recognized as a tender of possession for the purpose of rescission. It does not operate to place the parties in statu quo, which signifies that the vendor must be reinstated in his original possession. In addition to this, the land had been subdivided, and certain avenues were dedicated to the public. A statu quo basis involves a vacation of the plat and restoration of the land to the original condition in which it was at the time the agreement was entered into. This was not done, nor was there any effort to vacate the plat and thus get rid of the dedicated avenues through it. Thus considered, Keenan was not in a position to rescind, even had he tendered back possession, because he could not place the plaintiffs in possession of that which he bargained for in the condition in which it was at the time. Keenan is therefore not entitled to recover back the purchase money paid in pursuance of the agreement.

[8] Now we come to the question whether complainants are entitled to their foreclosure. Subsequent to the institution of this suit, the complainant W. J. Gregory began a suit against all parties interested in the title to this land, to quiet title thereto. Decree was obtained in due course, and a supplemental bill was filed herein, prior to a hearing on the merits, setting up the facts showing that the title to all the land in controversy had been quieted by that proceeding.

The defendant insists that the court was without jurisdiction to quiet this title, because the plaintiff was not at the time in possession of the land. The complaint in that proceeding shows that, since the execution of the contract here in question, which is referred to and made a part thereof, Keenan has been in possession of the premises by virtue of such contract. Thus it is shown that Gregory had and has a potential interest in the premises, and a right to have the title quieted. The court unquestionably had jurisdiction of the subject-matter, and the record shows that it obtained jurisdiction of the persons of defendants therein in pursuance of the act of the legislative assembly of the state of Oregon, filed in the office of the secretary of state February 23, 1911 (page 439, Sess. Laws 1911), relating to suits pertaining to real estate, and providing for service on unknown defendants. The decree was therefore not wholly void for want of jurisdiction in the court to render it, and hence was not subject to collateral attack such as is here made upon it, and must be held to have quieted the title to the premises against the objection of the defendant. This suit was effective to clear up the title to all the lands

the title to which is challenged by the defendant, and renders it merchantable or marketable, within the covenant of the vendors.

[9] Now it is a rule of law, well settled by ample authority, that when time is not of the essence of the agreement, or the delay has been the fault of the defendant, and there has been no element of fraud in the bargain, the complainant may, if he can, clear away difficulties in the title before the final decree. The rule was so announced in the case of Kentucky Distilleries & Warehouse Co. v. Blanton, 149 Fed. 31, 41, 80 C. C. A. 343, decided by the Circuit Court of Appeals for the Sixth Circuit; Lurton, Circuit Judge, delivering the opinion. The case was one for specific performance of a contract. The point was specifically made that at the time of filing the bill the complainant was not able to comply with all of the terms of the contract, and that the tender then and thereby made was not sufficient. But the learned jurist disposed of the objection by declaring that it was not necessarily fatal, and that if the vendor "was able to correct defects in the title, and clear away incumbrances without unreasonable delay, he should be allowed to do so before final decree." It was following this determination that the rule aforestated was announced.

In further support of the principle, reference may be had to the following authorities: Hepburn et al. v. Dunlop & Co., 1 Wheat. 179, 4 L. Ed. 65; Kimball v. West, 15 Wall. 377, 21 L. Ed. 95; Dresel v. Jordan, 104 Mass. 407; Chrisman v. Partee, 38 Ark. 31; McKinney v. Jones, 55 Wis. 50, 11 N. W. 606, 12 N. W. 381; Logan v. Bull, 78 Ky. 607; Collins v. Park, 93 Ky. 6, 18 S. W. 1013; and 36 Cyc. 627.

It is clear the delay in closing up the purchase is attributable to the defendant, for he had long defaulted in his payments. He attempted to put the plaintiffs in default by making a tender of payment and of the restoration of the possession of the property, but in this he failed, especially as respects a tender of the restoration of the possession of the land, as has been herein previously determined, so that he is still in default within the purview of the rule.

If the rule is applicable in a suit to have the defendant specifically perform, he being the vendee, there seems to be no good reason why it should not apply with like force and consequence in a suit to foreclose the contract by the vendors, such as this is.

Plaintiffs are entitled to their foreclosure, and a decree will be entered accordingly for the amount demanded, and for $1,000 additional as reasonable attorney fee.